NUMBER 13-08-00592-CR



COURT OF APPEALS



THIRTEENTH DISTRICT OF TEXAS



CORPUS CHRISTI - EDINBURG 


 


FELIX TOVAR, III, Appellant,


v.



THE STATE OF TEXAS, Appellee.

 


On appeal from the 156th District Court 

of Bee County, Texas.

 


MEMORANDUM OPINION


Before Justices Rodriguez, Garza, and Benavides 


Memorandum Opinion by Justice Rodriguez



 A jury convicted appellant, Felix Tovar, III, of one count of aggravated sexual assault
of a child, three counts of indecency with a child by contact, and three counts of indecency
with a child by exposure. See Tex. Penal Code Ann. §§ 22.021(a)(1)(B), 21.11(a)(1),
(a)(2)(A) (Vernon Supp. 2009). Each conviction was subject to an enhancement for a prior
felony committed by appellant. See id. § 12.42(b), (c)(1) (Vernon Supp. 2009). Tovar was
sentenced to forty years' incarceration for aggravated sexual assault of a child, twenty
years' incarceration for each count of indecency with a child by contact, and fifteen years'
incarceration for each count of indecency with a child by exposure. Punishment for each
count was ordered to run concurrently at the Institutional Division of the Texas Department
of Criminal Justice (ID-TDCJ). Appellant presents one issue challenging the factual
sufficiency of the evidence in support of his convictions. We modify the judgment and
affirm as modified. 


I. Background 


 Appellant is the uncle of the three alleged female victims: R.M.T., S.B.T., and
S.J.T. (1) He was staying for a short period at the home of his brother, J.T., the father of the
three alleged victims, when the alleged offenses occurred. 

 On March 27, 2008, while in the lobby of a doctor's office, S.B.T. approached her
mother, C.T., and made the initial outcry. S.B.T. was nine at the time. Over the next two
days, S.J.T. and R.M.T. also outcried to C.T. Shortly thereafter, C.T. contacted Daniel Lee
Caddell, a member of her church and the captain of the criminal investigation division of
the Bee County Police Department. Captain Caddell took C.T.'s outcry witness statement. 
The three girls were subsequently interviewed at Children's Advocacy Center in Corpus
Christi, Texas. On May 7, 2008, R.M.T. made an additional outcry in a pre-indictment
interview with the district attorney and the crime victims coordinator, Christina Segovia. 
After R.M.T.'s additional outrcry, the three victims were physically examined by a Sexual
Assault Nurse Examiner (SANE nurse) at Driscoll Hospital. 

 The trial commenced on October 1, 2008, and appellant pleaded not guilty to all
counts. The State proceeded on all eight counts from the indictment. (2)

 The State called ten witnesses to testify as to the allegations. The witnesses
included Captain Caddell; the three alleged victims; Segovia; the victims' mother, C.T.; the
victims' father, J.T.; a fellow inmate of appellant's, Daryl Howell, II; the lead forensic
interviewer at Children's Advocacy Center, Ricardo Jimenez; and SANE nurse Sonja
Eddleman. 

A. Captain Caddell's Testimony

 Captain Caddell testified regarding his involvement with this case and his
experience with sexual abuse cases. He stated that C.T. came to his office and reported
to him that her three daughters told her that their uncle, appellant, had inappropriate sexual
contact with them. He took an outcry witness statement from C.T. and scheduled an
interview for the three girls at the Children's Advocacy Center. 

 On March 31, 2008, Captain Caddell "observed [the] witnesses being interviewed
by" Ricardo Jimenez at the Children's Advocacy Center "via closed-circuit TV." In the
interview, the three girls revealed that their two brothers were in the room while the alleged
activities occurred. Following the interviews, he tried "to corroborate their statements." He
testified that he went to the home of C.T. where the alleged abuse occurred and
interviewed the two brothers; they had not seen or heard anything. Captain Caddell
confirmed that he did not find any corroborating evidence. 

 Captain Caddell testified that in his thirty-five years of experience, in some cases,
the word of a child without any physical evidence and no corroboration had been enough
to convict a defendant. He further attested that a Sexual Assault Nurses Examination
(SANE examination) is not always done if the child does not indicate "more than just
exposure or touching under the clothes." If they indicate more, "then at that point . . . they
will do a [SANE examination]." A SANE examination was not done here "because the first
interview did not indicate any type of sexual assault by contact."

 Captain Caddell testified that children will outcry more as they get comfortable. 

 The younger the child is[,] it isn't uncommon for them to make numerous
additional outcries. As they start going through the process they get more
comfortable in talking about what happened, and they will remember things. 
Normally it's disjointed and a lot of times not in sequence, but it's depending
on their age and maturity.

 

 Captain Caddell testified that on May 7, 2008, "additional outcries were made." 
Upon the second outcry, Captain Caddell scheduled a SANE examination. On May 13,
2008, all three girls went to Driscoll Hospital for the examination. Captain Caddell received
the medical reports and noted that there was no physical evidence collected and that there
was no DNA evidence to be found. 

 Additionally, Captain Caddell testified that he was present, along with the district
attorney, during a videotaped interview of Howell. Captain Caddell and the district attorney
"interviewed him and he told [them] what the Defendant had been saying about the case." 
 Captain Caddell testified that at no time during the interview were any promises made
regarding Howell's pending felony case. 

B. R.M.T.'s Testimony

 R.M.T. testified that she is currently five years old and was present to talk about
"Uncle Felix." R.M.T. identified the mouth and genitals of an anatomically correct female
doll and named the part "where you tee-tee" as a "bump" and referred to the backside of
the doll as a "butt." R.M.T. also identified the parts of an anatomically correct male doll and
named the penis as "a pee-pee." In reference to appellant, R.M.T. said, "he wasn't nice
. . . he put his pee-pee . . . in the middle" and that it "hurt." She testified that it happened
more than once and she saw his "pee-pee." She also testified that she did not feel his
"pee-pee" and he did not do anything with his mouth. R.M.T. further testified that "Uncle
Felix" touches her "bump" with his "hands." 

 Over the course of her testimony, R.M.T. reported that "nobody else" but her "Mom
and Dad" were there when the alleged abuse occurred; that when this happened
everybody was at the "H.E.B."; that when this occurred it was nighttime and everybody was
"asleep"; that this happened in "my room"; that she was by herself with appellant on the
sofa; and that her mom and dad "were at the beach." 

 R.M.T. recalled a particular time when she and her brothers and sisters were alone
with appellant in the living room and the children were playing video games. R.M.T.
testified that while appellant was "sitting on the chair" in the living room "he stick his pee-pee out" and "he stuck it back in his pants." Then, R.M.T. testified "he got my sister . . . he
grabbed her with his hand . . . he put them on the lap" and "he stuck it out . . . then he . . . 
stuck it back in his pants." R.M.T. confirmed that appellant "got" both sisters. R.M.T.
testified that while on the chair "he sat me on his lap" and his "pee-pee" was "in the middle
part." 

 On cross-examination, R.M.T. admitted that she remembered telling Jimenez at the
Children's Advocacy Center that no one had ever touched her butt and that she had never
seen someone's "pee-pee" before. On redirect examination, R.M.T. testified that she had
seen "Uncle Felix['s] pee-pee." Additionally, R.M.T. divulged that appellant touched and
massaged "the pee-pee" in front of her while appellant saw her watching him. R.M.T.
described the following: when he massaged "the pee-pee" it changed and got "bigger." 
When asked what appellant would do to her at night, R.M.T. verbalized "butt" and pointed
to that location on the anatomically correct doll. When asked, "did it bleed?" R.M.T.
responded "yes."

 When recalled to testify, R.M.T. attested that appellant licked "the butt" with his
tongue and that he licked the front part; that it felt "hard"; that it hurt; that it occurred with
"me and my sisters" in the room; and that it occurred in the living room at night. 

 On cross-examination, during her recall, R.M.T. testified that the alleged abuse
occurred in the same room while her brothers and sisters were present; that her siblings
were "at the beach"; that her family left "Uncle Felix" at home with her while they went to
the beach; that she was left alone with appellant while the family was at the beach "five
times"; that nobody was around at those times; and that "me and my brothers" were there. 
C. Segovia's Testimony

 Segovia, the crime victims coordinator for the Bee County district attorney's office,
testified that she was the outcry witness for R.M.T. and was present when the district
attorney interviewed the three alleged victims. At the interview on May 7, 2008, Segovia
stated that "we were just thinking we were going to have the child come in and let us know
about one incident that occurred with the Defendant." However, "when R.M.T. came in
[she] just came out and started telling us a whole lot more . . . ." Segovia testified she took
notes during the interview with R.M.T. and composed the outcry statement. In the
interview. R.M.T. "told us that her uncle . . . had put his private part into her tushie." When
referring to "her tushie," R.M.T. pointed to the female front of her sexual organ. Segovia
recalled that R.M.T. "took the two dolls and showed us that he had put it inside her front
tushie." Segovia testified that R.M.T. "went on to tell us that he had licked her . . . on her
tushie"; that "it tickled"; "that he had laid her on the couch and she didn't have any clothes
on when he did this." Segovia testified that following R.M.T.'s outcry, all of the girls went
to Driscoll Hospital for a SANE examination.

D. S.J.T.'s Testimony

 S.J.T. testified that she is eight years old and that appellant "is my uncle." S.J.T.
identified the male genitalia on the anatomically correct doll as "the middle" and the behind
portion as "the butt." Upon being asked if S.J.T. has "ever seen anybody's middle before," 
S.J.T. responded, "Felix . . . when I was sitting on his lap . . . [in] the living room . . . on the
couch." S.J.T. further testified that "he put his middle on my butt." 

 S.J.T. recalled the particular time when she and her brothers and sisters were alone
with appellant in the living room and the children were playing video games. S.J.T. testified
that appellant "grab[bed] her hand and pulled her on the lap," and agreed with the
statement that "he held you on his lap and he had his private out . . . he was touching your
butt." S.J.T. showed the jury with the anatomically correct dolls how she was sitting on
appellant's lap, that she was not straddling appellant but facing away from appellant. 
S.J.T. testified that he held her on his lap for eight seconds "squeezing my hand . . .
holding my arms." S.J.T. further testified that appellant tried to put it in her "butt," however
it did not go inside her butt--she had on pajamas and panties. S.J.T. attested that when
she was on appellant's lap, he told her "be my girlfriend" and "I said no." When asked if
she "remember[ed] how he took it out of his pants," S.J.T. responded "yes." Soon after,
when asked "did you see him take it out of his pants," S.J.T responded "No." S.J.T.
testified that while she was on appellant's lap, she felt it on her and that she is sure it was
his private. She also testified that she actually saw his private and that it happened more
than once.

 S.J.T. described further seeing appellant grab S.B.T. in the living room and sit her
on his lap. At first, S.J.T. testified she did not see appellant do anything to R.M.T. Then,
S.J.T. modified her statement and said that she did see appellant grab "[R.M.T.] and he
tried to sit her on his lap." S.J.T. further explained that her brothers did not see what was
happening because they were playing video games. S.J.T. testified that my "sister ran to
my Mom's room knocking on the door that Felix was saying--I mean, [R.M.T.] was saying
Felix is having sex with me." 

 S.J.T. testified that she was the first to tell her mom about the alleged abuse; that
she "didn't tell nobody" right after she got off appellant's lap; that it was a long time before
she told anyone; that she told her mom after appellant left the house; and that the first
person she told was "my Mom." 

 On cross-examination, S.J.T. testified that she remembered talking to Jimenez at
Children's Advocacy Center. S.J.T. admitted that some of the things she told him are
different than her testimony. S.J.T. remembered telling Jimenez that she never saw
appellant's middle or private parts. S.J.T. also confirmed that in her interview, she stated
that appellant did not say anything to her and that now she testified that he said, "be my
girlfriend." When asked, "which one happened," S.J.T declared, "he said be my girlfriend." 
S.J.T. agreed that just today, she remembered that R.M.T. ran down the hall, knocked on
her mom's door, and that she said that Felix had sex with her. 

E. S.B.T.'s Testimony

 S.B.T. testified that she is ten years old, enjoys school, and has two brothers and
three sisters. She remembers that appellant was staying at the house "because he didn't
have anywhere to stay." S.B.T. testified that while "we were playing games . . . he grabbed
me and my sisters, put us on his lap and [it] just didn't feel right." S.B.T. used the
anatomically correct dolls to demonstrate how he "sat us on his lap" and had them facing
the same way he was facing and was "pushing me front-way and back-way." She did not
see his "middle out." She first testified that she could not feel anything on her bottom, that
he was pushing "with his hands." Then, S.B.T. explained that she did feel his middle "for
a little" touching "on my leg here" and "under." 

 S.B.T. described the particular time when she and her brothers and sisters were
alone with appellant in the living room and the children were playing video games. She
recalled that S.J.T. was the first sister he put on his lap and she "saw him moving
her . . . ."  Then, "he did the same to R.M.T." S.B.T testified that while on appellant's lap,
"my little sister [R.M.T.] fell down . . . she was crying so I went to go help her . . . ."  In
further testimony, she recalled that "my sister [S.J.T] runned . . . tried to go to my mom but
the door was locked." She recalled that S.J.T. banged on their mother's door while she
tended to her crying sister R.M.T. She also recalled that while she was on appellant's lap,
R.M.T banged on their mother's door, and after she got away, they all banged on their
mother's door. 

 S.B.T. testified that she told her mother twice about the incident with appellant. 
First, on the day after the incident, she testified that she told her mother and "she got
mad . . . real mad." She recalled that appellant left the house and that her mom did not tell
anybody. S.B.T. testified that she told her mother a second time coming home from a
doctor's appointment. "I told her again when we went over there to the--Corpus . . . I told
her again." In reference to her mother, S.B.T. stated that "sometimes she forgets stuff." 
F. C.T's Testimony 

 C.T., the mother of the three alleged victims, testified that she was the outcry
witness and a mother of six children. None of her daughters are married. She remembers
the girls initially telling her about the alleged incident when "we had went to a doctor's
appointment . . . we were waiting to be seen and that's when they had come up to me and
told me." She testified that S.B.T. "came up to me and she told me crying . . . that they
were playing their V.Smile [video game] and that he had tried to grab them and put them
on his lap . . . and she said she felt very uncomfortable . . . [and] this happened to all of
them . . . it was the three girls."

 C.T. testified to the contents of the outcry statements her three daughters made
to her against appellant. S.B.T. "said that he had took . . . pee-pee out and . . . he
had . . . put them on his lap" and told her that she had seen appellant's "pee-pee." S.J.T.
"said that Felix [appellant] sat me on his lap and [I] asked her . . . if she saw anything else,"
and S.J.T. "said, yes, mom . . . he was trying to pull . . . he was trying to put it where my
butt was." She then asked S.J.T. if she had any clothes on, and "she said yes." C.T. read
the following from her original statement regarding R.M.T.'s initial outcry: "Saturday
sometime in the morning R.M.T. came to me to my bed and she just came out and told me
Felix is a bad man and he was going to go to hell because he had took his pee-pee out .
. . we were playing a game and he was trying to sit me on his lap . . . and she said he took
it out, his pee-pee, and was massaging it . . . ." 

 C.T. testified that when her daughters outcried, appellant was no longer living at
their house. After the initial outcry, she called her husband, J.T. "We talked to our families
and we told them what we were going to do and then . . . the next day . . . we went to the
police department and reported this." C.T. testified she brought them to Captain Caddell
"at the police station" and told him what the girls had disclosed. Then, "we had went
straight to the Children's Advocacy Center . . . then months later [the] interview with the
prosecutor [where R.M.T.] she had another outcry." After "baby [R.M.T's] outcry we went
to Corpus Christi . . . the Driscoll Hospital, and they checked the girls from head to toe to
make sure that he had not done anything else to them and stuff." 

 C.T. testified that March 27, 2008, was the first time she heard the allegations. She
does not recall the girls talking to her the day after the alleged incident and does not
remember the girls ever banging on the bedroom door on a weekend night. She testified
that "yes [she] would have" heard the children if they were banging on the bedroom door
and that she would have answered and not avoided the situation. 

G. J.T.'s Testimony 

 J.T. is the father of the three victims and the brother of appellant. He testified that
appellant lived with them "I would say about two weeks, maybe three." His wife first told
him about the outcry when he was out of town. He "told her to wait" and not to go to the
police "until I got down . . . that was like two days later . . . so I could be there." He
testified that they had discussed not filing charges because "I wanted to make sure the kids
weren't making something up." J.T. testified that "I believed it because they won't lie to me
about something like that . . . really they won't lie about something like that, you know, they
won't." 

 J.T. disclosed he was probably home during the time of the alleged abuse. He
testified that R.M.T. made an attempt to talk to him before S.B.T. made the initial outcry
to C.T. On a Saturday, while appellant "was in the living room with the kids watching TV,"
he recalled that "my daughter came up to me . . .the smallest one [R.M.T.] and she came
up to me . . . I blew it off . . . because . . . I thought she was playing around or
something . . . I just blew it off." J.T. stated that her attempt to tell him what had happened
occurred "before all of that stuff came out . . . that Saturday I guess." J.T. further testified
that he never took the family to the beach while appellant was staying at his home. He
agreed that it would not be normal to go to the beach in the month of February. He also
attested that he never left R.M.T. at home alone with appellant. 

H. Howell's Testimony

 Howell, an inmate incarcerated with appellant awaiting trial for his own felony
indictment, testified that appellant admitted guilt. On August 25, 2008, Howell wrote the
prosecution a letter "because I felt like I needed to do something . . . ." Howell further
testified that appellant "told me that he was guilty and that . . . he told me that it involved
three little girls and that the youngest was saying everything . . . ." Howell disclosed that
he wrote the letter "because . . . he was talking about children . . . I have two children of
my own, and for him to be telling me that he was guilty, it kind of upset me." He also
testified that he has not been offered any deal regarding the indictment in his felony case
and that "we haven't even discussed it." 

I. Jimenez's Testimony

 Jimenez, the lead forensic interviewer for the Children's Advocacy Center, testified
regarding his experience with child victims of sexual abuse and his interviews with the
three girls. He testified that "last year . . . the center saw 1,741 children" and that he works
with sexually abused children regularly. In his experience with child victims of sexual
abuse, he testified that "a lot of times children don't disclose fully . . . over time more
comes out . . . [an] incremental disclosure . . . we understand that is a natural process, that
more comes out." 

 On March 31, 2008, Jimenez interviewed the three alleged victims at the Children's
Advocacy Center. He testified specifically as to R.M.T.'s interview. He confirmed that at
the beginning of the interview with R.M.T., she told him the following: no one ever touched
her bottom; no one ever touched her butt; she had never seen someone's "pee-pee." He
further testified, at the end of the interview, when "I asked who is Felix . . . when I asked
the question who this person was . . . she elicited [a] response . . . different from the first
part . . . she did disclose" that she saw appellant's "pee-pee." Jimenez testified that R.M.T.
described appellant's penis; "she said it was big" and "she said to [appellant] put it up." 
Jimenez testified that R.M.T. never talked to him about penetration or oral sex during the
interview. 

J. Eddleman's Testimony

 Eddleman, the lead forensic nurse examiner at Driscoll Hospital, testified about the
medical records and the results of the SANE examination performed on each of the three
children. She testified that notations on the medical records were "made by the person
that was getting the medical history from the patient." She testified that on May 13, 2008,
the SANE nurse made the following notion on S.B.T.'s medical record: 

 When I was nine my Uncle Felix pulled me by the wrist. He put me on his
lap. He almost took out middle part. He was doing this. (Patient then
demonstrated rocking back and forth, rocking forward and backward motion.) 
I kicked him and he grabbed my sister S.J.T. My sister tried to get off. He
did the same thing to her. He put her on his lap. Another time he took it out
and was telling me touch it, touch it. I said, ["]no, I didn't want to.["] So we
were just playing with it.

 

Eddleman testified the SANE nurse wrote the following on S.J.T.'s medical records: "Uncle
Felix took out his middle. He stuck it out and put it in here (she indicated her butt by
pointing) on my pajamas. It hurt. He told me don't tell anyone he did it, but I told my Mom
he did it to me." The SANE nurse wrote the following on R.M.T.'s medical records: "Uncle
Felix touched me (she indicated her butt by pointing). He put me on his lap." 

 As far as the results of the SANE examinations, Eddleman testified "none of the
three had any genital trauma" and there was no DNA evidence found. She explained that
"eighty percent of the time we don't find any genital trauma," and we know what happened
"by what the patient told us." She also disclosed they only "collect DNA if we see the
patient within 96 hours or four days." Eddleman testified that in her experience she has
seen children with trauma and that on examination two weeks later the trauma is healed. 
She continued, "that part of the body heals incredibly rapidly [because] that part of the
body has the same vasculature, the same blood supply that your mouth does" and like the
mouth, "it heals itself without anything left over for us to visualize." Eddleman further
testified that in her experience "we know that children . . . test the waters . . . [and] tell what
happened in gradual steps, so they tell a bit about what happened to see the reaction of
'am I going to be in trouble.'" 

 On cross-examination, Eddleman confirmed that R.M.T. never made an outcry of
any type of penetration to the SANE nurse. She also confirmed that they found no physical
evidence of any trauma or sexual assault besides what the children told the sexual assault
nurse examiner. Eddleman agreed that the medical examination provided no physical
evidence one way or the other that this occurred or did not occur.

 At the conclusion of the evidence, the trial court granted appellant's motion for a
direct verdict as to Count 2. The jury found appellant guilty of Counts 1 and 3 through 8. 
This appeal followed. 

II. Standard of Review & Applicable Law

 When conducting a factual sufficiency review, we consider all of the evidence in a
neutral light to determine whether a jury was rationally justified in finding the defendant
guilty beyond a reasonable doubt. Grotti v. State, 273 S.W.3d 273, 283 (Tex. Crim. App.
2008). Analysis of a factual sufficiency review is based upon a two pronged approach. 
Watson v. State, 204 S.W.3d 404, 414-15 (Tex. Crim. App. 2006). The court of appeals
will set aside the verdict only if: (1) the overwhelming weight of the evidence is so weak
as to render the verdict clearly wrong and manifestly unjust, or (2) the jury's verdict is
against the great weight and preponderance of the evidence. Id. at 415 (citing Johnson
v. State, 23 S.W.3d 1, 10 (Tex. Crim. App. 2000)). "Although authorized to disagree with
the jury's determinations even if probative evidence exists which supports the verdict, a
reviewing court must give due deference to the fact finder's determinations concerning the
weight and credibility of the evidence and will reverse the fact finder's determination only
to arrest the occurrence of a manifest injustice." Swearingen v. State, 101 S.W.3d 89, 97
(Tex. Crim. App. 2003); see also Steadman v. State, 280 S.W.3d 242, 247 (Tex. Crim.
App. 2009); Grotti, 273 S.W.3d at 283. In conducting a factual sufficiency review, we are
"required to consider the most important evidence that the appellant claims undermines
the jury's verdict." Sims v. State, 99 S.W.3d 600, 601 (Tex. Crim. App. 2003). 

 Our review of a factual sufficiency challenge is measured by the elements of the
offense as defined by a hypothetically correct jury charge. Wooley v. State, 273 S.W.3d
260, 261 (Tex. Crim. App. 2008); Malik v. State, 953 S.W.2d 234, 240 (Tex. Crim. App.
1997). "Such a charge would be one that accurately sets out the law, is authorized by the
indictment, does not unnecessarily increase the State's burden of proof or unnecessarily
restrict the State's theories of liability, and adequately describes the particular offense for
which the defendant was tried." Malik, 953 S.W.2d at 240. 

 As to Count 1 (aggravated sexual assault of a child), a hypothetically correct jury
charge would ask the jury if the State proved that appellant: (1) on or about February 27,
2008; (2) intentionally or knowingly; (3) caused the penetration of R.M.T.'s sexual organ
by appellant's mouth; and (4) R.M.T. was then a child under six years old. See Tex. Penal
Code Ann. § 22.021(a)(1)(B)(iii). As to Count 3 (indecency with a child by contact), a
hypothetically correct jury charge would ask if the State proved that appellant: (1) on or
about February 16, 2008; (2) intentionally or knowingly; (3) engaged in sexual contact with
S.B.T. by touching her anus; (4) with the intent to arouse or gratify his sexual desire; and
(5) S.B.T. was then a child younger than seventeen years old and not appellant's spouse. 
See Id. § 22.11(a)(1), (c)(1). As to Count 4 (indecency with a child by contact), such a
charge would ask if appellant: (1) on or about February 16, 2008; (2) intentionally or
knowingly; (3) engaged in sexual contact with S.J.T. by touching her anus; (4) with the
intent to arouse or gratify his sexual desire; and (5) S.J.T. was then a child younger than
seventeen years old and not his spouse. See id. As to Count 5 (indecency with a child by
contact), such a charge would ask if appellant: (1) on or about February 16, 2008; (2)
intentionally or knowingly; (3) engaged in sexual contact with R.M.T. by touching her anus;
(4) with the intent to arouse or gratify his sexual desire; and (5) R.M.T. was then a child
younger than seventeen years old and not his spouse. See id. As to Count 6 (indecency
with a child by exposure), a hypothetically correct jury charge would ask the jury if the State
proved that appellant: (1) on or about February 16, 2008; (2) intentionally or knowingly;
(3) exposed his genitals; (4) knowing that S.B.T. was present; (5) with the intent to arouse
or gratify his sexual desire; and (6) S.B.T. was then a child younger than seventeen years
old and not his spouse. See Id. § 21.11(a)(2)(A). As to Count 7 (indecency with a child
by exposure), such a charge would ask if appellant: (1) on or about February 16, 2008; (2)
intentionally or knowingly; (3) exposed his genitals; (4) knowing that S.J.T. was present;
(5) with the intent to arouse or gratify his sexual desire; and (6) S.J.T. was then a child
younger than seventeen years old and not his spouse. See id. As to Count 8 (indecency
with a child by exposure), such a charge would ask if appellant: (1) on or about February
16, 2008; (2) intentionally or knowingly; (3) exposed his genitals; (4) knowing R.M.T. was
present; (5) with the intent to arouse or gratify his sexual desire; and (6) R.M.T. was then
a child younger than seventeen years old and not his spouse. See id.

 "The testimony of a child sexual abuse victim alone is sufficient to support a
conviction for indecency with a child or aggravated sexual assault." Soto v. State, 267
S.W.3d 327, 322 (Tex. App.-Corpus Christi 2008, no pet.). The courts will give wide
latitude to testimony given by child victims of sexual abuse. Villalon v. State, 791 S.W.2d
130, 134 (Tex. Crim. App. 1990) (en banc). The victim's description of what happened
need not be precise, and the child is not expected to communicate with the same level of
sophistication as an adult. Soto, 267 S.W.3d at 322. Furthermore, corroboration of the
victim's testimony by medical or physical evidence is not required. Id. at 332; Ozuna v.
State, 199 S.W.3d 301, 606 (Tex. App.-Corpus Christi 2006, no pet.). In addition, "outcry
testimony alone can be sufficient to sustain a conviction for aggravated sexual assault." 
Ozuna, 199 S.W.3d at 606 (citing Rodriguez v. State, 819 S.W.2d 871, 873-74 (Tex. Crim.
App. 1991)). 

 The State is not required to present direct evidence, such as eyewitness testimony,
to establish guilt. See Guevara v. State, 152 S.W.3d 45, 49 (Tex. Crim. App. 2004). 
"Circumstantial evidence is as probative as the direct evidence in establishing guilt of the
actor, and circumstantial evidence alone can be sufficient to establish guilt." Hooper v.
State, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007); see Guevara, 152 S.W.3d at 49. The law
does not require that each fact "point directly and independently to the guilt of the
appellant, as long as the cumulative effect of all the incriminating facts is sufficient to
support the conviction." Hooper, 214 S.W.3d at 13; see Guevara, 152 S.W.3d at 49. In
regard to contradictory witness testimony, even when contradicting evidence is compelling,
the court must give deference to the fact-finder's decision, unless the record clearly reveals
an appropriate contrary result. Lancon v. State, 253 S.W.3d 699, 705 (Tex. Crim. App.
2008). 

III. Discussion

 In his only issue on appeal, appellant contends that the evidence is factually
insufficient to support his convictions because the witness statements made by the three
alleged victims were uncorroborated and contradictory . Specifically, appellant argues that,
based on the evidence adduced at the trial, a jury could not be rationally justified in finding
him guilty beyond a reasonable doubt, and that the fact-finder's decision of guilt is clearly
morally wrong and unjust. The State asserts, without conceding the question as to whether
or not the testimony of the three alleged victims was corroborated, that the testimony of a
child victim alone is sufficient to support a conviction. Furthermore, the State argues that
appellant has not shown that the evidence is factually insufficient. 

 R.M.T. testified that at the time of the alleged incidents, she was four years old. She
stated that appellant "sat me on his lap . . . [stuck] his pee-pee out" and "put his pee-pee . . . in the middle part." She also recalled that appellant "got" both of her sisters and
"put them on his lap . . . stuck it out . . . stuck it back in his pants." Additionally, R.M.T.
attested that appellant "massaged . . . the pee-pee" in front of her and it got "bigger." In
further testimony, R.M.T. alleged a second incident where appellant licked "the butt" and
her vagina. S.J.T. testified that at the time of the alleged incidents, she was seven years
old. S.J.T. recalled seeing appellant's penis and that while on his lap he put his "middle
on [her] butt" and he tried to put it in her "butt." She further explained that she witnessed
appellant grab each of her sisters and place them on his lap. S.B.T. testified that she was
nine years old at the time of the alleged incidents. In S.B.T.'s testimony, she recalled that
appellant grabbed her and her sisters and put them each on his lap in the living room as
her brothers played video games. She demonstrated with anatomically correct dolls how
appellant pushed her "front-way and back-way" while she was on his lap. S.B.T. further
attested that she felt his "middle" touching on her leg, but did not see his "middle."

 Appellant argues that the evidence is factually insufficient to support a finding of
guilt because the decision is based on contradictory and uncorroborated testimony of the
three alleged minor victims. We disagree. As previously noted, in sexual abuse cases
involving a child, the testimony of the victim alone is sufficient to support a conviction, and
the victim's description need not be at the same level of sophistication as an adult. See
Soto, 267 S.W.3d at 322; see also Tex. Code Crim. Proc. Ann. art. 38.07 (Vernon 2005). 
Furthermore, as noted previously, the victim's testimony does not need to be corroborated
by eyewitnesses or physical medical evidence. See Soto, 267 S.W.3d at 322. In addition,
outcry testimony can be enough to support a conviction for aggravated sexual assault of
a child. See Ozuna, 199 S.W.3d at 606. 

 Moreover, we believe that ample other testimonial evidence was presented at trial
to support the jury's decision. The allegations by the three alleged victims were made on
repeated occasions and to multiple individuals. Their mother, C.T., testified that on March
27, 2008, S.B.T. made the initial outcry, followed by S.J.T.'s disclosure about appellant. 
C.T. further recalled that on March 29, 2008, R.M.T. first confirmed the initial outcry and
"told me Felix is a bad man and going to hell because he had took his pee-pee out . . . and
was massaging it." Jimenez testified that on March 31, 2008, in R.M.T.'s interview at the
Children's Advocacy Center, she disclosed that she saw appellant's penis and described
it as "big." Further, Segovia testified that on May 7, 2008, R.M.T. made an additional
outcry that appellant "put his private in her tushie" and performed oral sex "on her tushie." 
Eddleman testified that before the victims' SANE examinations on May 13, 2008, they each
repeated the allegations to the nurse examiner who wrote their disclosures on the medical
records. Eddleman explained that no DNA evidence was found because they only "collect
DNA evidence if we see the patient within ninety-six hours" of the alleged abuse. In
addition to the three victims' testimony and their repeated allegations, Howell testified that
appellant admitted his guilt to him and further disclosed "that it involved three little girls and
that the youngest [R.M.T.] was saying everything . . . ."

 We do note some contradictory statements made by the three victims. See Sims,
99 S.W.3d at 601 (requiring the reviewing court to consider the evidence that appellant
claims most undermines the verdict). R.M.T.'s testimony varied as to who was present
when the alleged abuse occurred. She testified that when the alleged abuse occurred that
"nobody else" was there except "Mom and Dad"; that it occurred in the same room while
her brothers were present; that she was alone and everyone was at the "H.E.B."; that it
happened in "my room"; that it occurred while everyone was "at the beach"; and that her
family left her alone with appellant "five times" while they were "at the beach." 

 S.J.T.'s testimony is, at times, similarly contradictory as to whether she actually saw
appellant's penis. S.J.T. responded "yes" when asked if she "remember[s] how" appellant
took his penis "out of his pants." Shortly thereafter, S.J.T. contradicted her testimony by
responding "no" when asked if she saw "him take it out of his pants." In continued
testimony, S.J.T. clarified and said that, "yes," she actually saw appellant's penis. S.J.T.
provided further contradictory testimony when she testified that she did not see appellant
do anything to R.M.T., only to later state that she saw appellant grab "[R.M.T.] and he tried
to sit her on his lap." On cross-examination, S.J.T. admitted to inconsistencies between
her statements made in testimony and the ones she made on March 31, 2008, in her
interview with Jimenez at the Children's Advocacy Center. S.J.T. admitted she told
Jimenez she never saw appellant's private parts and now she testified that she did see
appellant's penis. S.J.T. further conceded that in the interview with Jimenez, she said that
appellant did not say anything to her and now she testified that "he said be my girlfriend." 
In addition, S.J.T. agreed that during her testimony it was the first time she remembered
that her "sister ran to my Mom's room knocking on the door that Felix was saying--I mean
[R.M.T.] was saying Felix is having sex with me." C.T. testified that she does not recall a
time when the girls ever banged on her bedroom door and that she would have answered
the door if she had heard such banging. Additionally, S.J.T testified that she was the first
sister to tell her mother about the alleged abuse. However, C.T. testified that S.B.T. was
the first to tell her about the allegations. 

 S.B.T.'s testimony varied as to whether she actually felt anything on her bottom
when appellant allegedly had her in his lap. At first, S.B.T. testified that she only felt
appellant pushing her "with his hands" and could not feel anything on her bottom. S.B.T.
later modified her statement and explained that she felt his penis touching her bottom "for
a little. . . . [o]n my leg here . . . [and] under." In addition, S.B.T. testified that all three of
her sisters banged on her mother's door, thus contradicting C.T.'s testimony. 

 Even in light of the apparent inconsistencies and contradictory testimony of the three
child victims, we note that it was within the realm of the fact finder to judge the credibility
of the witnesses and decide the weight to be given to the various testimonies. See Tex.
Code Crim. Proc. Ann. art. 36.13 (Vernon 2007); Swearingen, 101 S.W.3d at 97. As
noted previously, we give deference to the jury's determination on contradictory witness
testimony, unless the record clearly reveals an appropriate contrary result--which is not
the case here. Lancon, 253 S.W.3d at 705. Viewing the evidence in a neutral light, we
cannot conclude that the jury's verdict was clearly wrong, manifestly unjust or against the
great weight and preponderance of the evidence. See Watson, 204 S.W.3d at 414-15;
Grotti, 273 S.W.3d at 283. We, thus, conclude the evidence is factually sufficient to
support the jury's verdicts. Appellant's sole issue is overruled. 

IV. Modification of the Judgment

 The Texas Rules of Appellate Procedure give this Court authority to modify
judgments to correct errors and make the record speak the truth. See Tex. R. App. P. 43.2;
French v. State, 830 S.W.2d 607, 609 (Tex. Crim. App. 1992) (en banc); Rhoten v. State,
299 S.W.3d 349, 356 (Tex. App.-Texarkana 2009, no pet.); Gray v. State, 628 S.W.2d
228, 233 (Tex. App.-Corpus Christi 1982, pet. ref'd). Appellant was indicted on eight
counts: sexual assault of a child (Counts 1-2); indecency with a child by contact (Counts
3-5); and indecency with a child by exposure (Counts 6-8). As previously noted, a verdict
of not guilty was returned on Count 2 as a result of the trial court's granting of a motion for
a directed verdict. The jury found appellant guilty of the remaining seven counts. 

 Each count of conviction was subject to an enhancement for appellant's prior felony
conviction for unauthorized use of a motor vehicle. Thus, Count 1, a first-degree felony,
was punishable by twenty-five to ninety-nine years in prison. See Tex. Penal Code Ann.
§ 22.021(e), (f)(1) (providing that sexual assault of a child is a first-degree felony that is
punishable by a minimum of twenty-five years' imprisonment if the victim is younger than
six years of age at the time of the offense); § 12.42(c)(1) (Vernon Supp. 2009) (providing
that if it is shown on the trial of a first-degree felony that the defendant was previously
convicted of a felony, the range of punishment is fifteen to ninety-nine years incarceration
in the ID-TDCJ). Counts 3 through 5, second-degree felonies, were raised to first-degree
felonies and were punishable by fifteen to ninety-nine years in prison. See id. §§ 12.42(b),
(c)(1), 21.11(a)(1), (d). Counts 6 through 8, third-degree felonies, were raised to
second-degree felonies and were punishable by two to twenty years in prison. See id. §
12.33(a) (Vernon Supp. 2009); § 21.11(a)(2), (d). All seven counts were subject to a
$10,000 maximum fine. See id. §§ 12.33(b), 12.42(c)(1). 

 However, the trial court's judgment of conviction reflects, in error, that all counts are
first-degree felonies with an applicable punishment range of fifteen to ninety-nine years'
or life imprisonment. (3) Therefore, we modify the trial court's judgment to describe Count 1
as a first-degree felony with an applicable punishment range of twenty-five to ninety-nine
years' imprisonment; Counts 3 through 5 as first-degree felonies with an applicable
punishment range of fifteen to ninety-nine years' imprisonment; and Counts 6 through 8
as second-degree felonies with an applicable punishment range of two to twenty years'
imprisonment. (4) 

V. Conclusion

 We affirm the judgment as modified.


 NELDA V. RODRIGUEZ

 Justice 

 

Do not publish.

Tex. R. App. P. 47.2(b).


Delivered and filed the

15th day of July, 2010.
1. To protect the identity of the children, in our opinion, we use aliases, i.e. initials, to refer to the minors
and to the minors' parents.
2. Count 1 alleged that on or about February 27, 2008, appellant intentionally or knowingly penetrated
the sexual organ of R.M.T., a child younger than six years of age and not the spouse of the appellant, by the
appellant's mouth. Count 2 alleged that on or about February 27, 2008, appellant intentionally or knowingly
penetrated the sexual organ of R.M.T., a child younger than six years of age and not the spouse of the
appellant, by the appellant's sexual organ. Count 3 alleged that appellant, on or about February 16, 2008, with
the intent to arouse or gratify the sexual desire of said defendant, intentionally or knowingly engaged in sexual
contact with S.B.T., a child younger than seventeen years of age and not the spouse of the appellant, by
touching the anus of S.B.T. Count 4 alleged that appellant, on or about February 16, 2008, with the intent to
arouse or gratify the sexual desire of said appellant, intentionally or knowingly engaged in sexual contact with
S.J.T., a child younger than seventeen years of age and not the spouse of the appellant, by touching the anus
of S.J.T. Count 5 alleged that appellant, on or about February 16, 2008, with the intent to arouse or gratify
the sexual desire of said appellant, intentionally or knowingly engaged in sexual contact with R.M.T., a child
younger than seventeen years of age and not the spouse of the appellant, by touching the anus of R.M.T. 
Count 6 alleged that appellant, on or about February 16, 2008, with the intent to arouse or gratify the sexual
desire of said appellant, intentionally or knowingly exposed the appellant's genitals knowing that S.B.T., a child
younger than seventeen years of age and not the spouse of the defendant, was present. Count 7 alleged that
appellant, on or about February 16, 2008, with the intent to arouse or gratify the sexual desire of said
appellant, intentionally or knowingly exposed the defendant's genitals knowing that S.J.T., a child younger than
seventeen years of age and not the spouse of the appellant, was present. Count 8 alleged that appellant, on
or about February 16, 2008, with the intent to arouse or gratify the sexual desire of said appellant, intentionally
or knowingly exposed the appellant's genitals knowing that R.M.T., a child younger than seventeen years of
age and not the spouse of the appellant, was present. 
3. The judgment correctly reflects that all counts were subject to a maximum fine of $10,000.
4. We note that the trial court sentenced appellant within the correct applicable punishment ranges: 
forty years' imprisonment for Count 1; twenty years' imprisonment each for Counts 3 through 5; and fifteen
years' imprisonment each for Counts 6 through 8. No fine was imposed, and the sentences were ordered to
run concurrently.